UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FORTUNATO GARCIA,                    :
                                     :
         Plaintiff,                  :
                                     :
         v.                          :      CASE NO. 3:08CV95(DFM)
                                     :
ROBERT HEBERT et al.,                :
                                     :
         Defendants.                 :

RULING OF SUMMARY JUDGMENT

Plaintiff Fortunato Garcia brings this action against
police officers and courthouse employees alleging misconduct in
connection with his arrest and prosecution on state criminal
charges.  Pending before the court are plaintiff's Motion in
Limine (doc. #225), defendants' Motions for Summary Judgment
(docs. #217, #218 and #220) and plaintiff's Cross-Motions for
Summary Judgment (docs. #227, #230 and #233).  For the reasons
that follow, plaintiff's Motion in Limine is denied, the
defendants' Motions for Summary Judgment are granted and
plaintiff's Cross-Motions are denied.

I.   Procedural History

Plaintiff commenced this action in January 2008.  (Doc.
#1.)  His Second Amended Complaint alleges deprivations of his
rights under the Fourth, Fifth, Sixth and Fourteenth Amendments
pursuant to 42 U.S.C. § 1983; false arrest, malicious

prosecution, abuse of process under § 1983 and state law; and defamation and intentional infliction of emotional distress under state law.  (Doc. #137.)  The case has been partially resolved by way of rulings.  In June 2008, the court granted default judgment against defendant Robert Hebert.  (Doc. #39.) In March 2009, the court dismissed defendant Assistant State's Attorneys Magdalena Campos and Andrew Wittstein and dismissed the official capacity claims against defendant Lisa Killiany. (Docs. #94, #99.)  In April 2009, the court denied plaintiff's motion for summary judgment against those defendants as moot. (Doc. #100.)  In December 2009, the Second Circuit affirmed the rulings of dismissal on interlocutory appeal.  (Doc. #127.)  In December 2011, the court declined to vacate its ruling of dismissal as to the official capacity claims against Killiany, and it dismissed the official capacity claims against defendant Jane Serafini.  (Docs. #192, #193, #202.)  In April and May 2012, the parties filed the pending cross-motions for summary judgment, with separate statements of facts from each party pertaining to each of the six motions.[1]  In September 2012, they consented to the authority of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Doc. #276.)

---

[1]The filings that pertain to the pending motions are voluminous.  See Appendix of Filings by ECF Number.

II.  <u>Jurisdiction</u>

Plaintiff brings both federal and state claims.  The court has original jurisdiction over the federal claims under 28 U.S.C. § 1331.  Because the state-law claims "derive from a common nucleus of operative fact," <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 725 (1966), and "the values of judicial economy, convenience, fairness, and comity" militate in favor of supplemental jurisdiction, <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988), the court exercises supplemental jurisdiction under 28 U.S.C. § 1367(a).[2]

III. <u>Undisputed Facts</u>

The following facts are undisputed.  On November 23, 2006, a Thanksgiving holiday, defendant Robert Hebert went shopping at

---

[2]The court is mindful that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7, (1988), <u>quoted in</u> <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003).  Here, considerations of economy, convenience and fairness militate in favor of supplemental jurisdiction.  Discovery is complete, and all issues are ripe for adjudication.  The court has decided a motion for default judgment and two motions to dismiss, one of which was relitigated in an interlocutory appeal and motion to vacate.  Plaintiff also filed a prior motion for summary judgment, which the court denied as moot.  There are no novel questions of state law.  <u>See</u>, <u>e.g.</u>, <u>Raucci v. Town of Rotterdam</u>, 902 F.2d 1050, 1055 (2d Cir. 1990) (exercising supplemental jurisdiction where discovery was complete; the court had decided three dispositive motions; the case was trial-ready; and the state-law claims involved only settled principles).

a Kmart in Torrington with defendant Lisa Killiany.  The two were married at the time, and Hebert recently had begun working as a police officer in the Town of Winchester.  (Hebert Dep. at 7; Pl.'s 56(a)(1), doc. #230-1 at ¶2; Killiany's 56(a)(2), doc. #259 at ¶2.)  A store surveillance video from that day shows that Hebert reached the cash register at 12:49 p.m.  He handed his wallet to Killiany, who removed cash, handed it back and walked away.  Hebert placed his wallet on a side counter and proceeded to unload the shopping cart.  After the cashier had scanned all his purchases, Hebert paid with a credit card and walked away without retrieving his wallet.  (Kmart Video, doc. #223 at 12:49-51.)  Plaintiff Fortunato Garcia was the next customer in line.  (Garcia Dep., doc. #222-11 at 105.) Plaintiff placed his wallet on the main counter in front of him. Then he took Hebert's wallet from the side counter, placed it on top of his own wallet and covered it with his hand, concealing it from the cashier.  (Kmart Video, doc. #223 at 12:52.) Plaintiff handed cash to the cashier and, when she turned to the cash register, he put both wallets in his jacket pocket. Simultaneously, Hebert appeared at the end of the checkout line, looking all around.  (Kmart Video at 12:52.)  Hebert panicked because his wallet contained money, credit cards and his police badge.  He said to Killiany: "I don't know what I'm going to do."  (Hebert Dep. at 12; Pl.'s 56(a)(1), doc. #230-1 at ¶3;

4

Killiany's 56(a)(2) at ¶3.)  Plaintiff received change from the
cashier and walked away with his receipt and purchases.  (Kmart
Video, doc. #223 at 12:53.)  As plaintiff walked toward the
exit, Hebert and Killiany stopped him and asked in in English,
"Did you see a wallet on the counter?"  Plaintiff said "No" and
walked out of the store.  (Hebert Dep. at 12; Killiany Dep. at
10-11; Garcia Dep. at 105-106.)

Defendant Hebert had only been employed as a police officer
for a short while and was anxious that his employer would "bust
his stones" for losing his badge.  (Hebert Dep. at 13; Pl.'s
56(a)(1), doc. #230-1 at ¶3; Killiany's 56(a)(2) at ¶3.)  He
could have been written up.  (Hebert Dep. at 29-32.)  He
notified the Winchester Police Department, which logged the
incident as "Officer lost wallet."  (Hebert Dep. at 13; Activity
Log, doc. #233-11.)  Hebert then reported the incident to the
Torrington Police Department.  The duty officer was defendant
Officer John Guerrera, who was in his seventh year as a police
officer with the Torrington Police Department.  (Guerrera Dep.
at 6; Pl. 56(a)(1), doc. #233-1 at ¶ 1.)  Officer Guerrera met
Hebert at Kmart, where they viewed a surveillance video of the
incident.  ((Pl.'s 56(a)(1), doc. #233-1 at ¶¶2-3; Guerrera's
56(a)(2), doc. #254 at ¶¶2-3; Killiany's 56(a)(1), doc. #219 at
¶¶7-8, Pl.'s 56(a)(2), doc. #229 at ¶¶7-8.)  Officer Guerrera
took the video to the Torrington Police Department, where it was

viewed by another police officer.  (Pl.'s 56(a)(1), doc. #230-1
at ¶4; Killiany's 56(a)(1) at ¶13.)  That officer thought he
recognized the man who took the wallet as someone named Weston,
and he went out in a patrol car to look for him.  (Pl.'s
56(a)(1), doc. #233-1 at ¶¶3-4; Guerrera's 56(a)(2), doc. #254
at ¶¶3-4.)

Later that afternoon, plaintiff and a relative brought
Hebert's wallet to the Torrington Police Department.  Defendants
Killiany and Hebert were there.  On seeing plaintiff, Killiany
said "Remember me, motherf---er?"  (Killiany Dep. at 33; Pl.'s
56(a)(1), docs. #233-1 at ¶5, #230-1 at ¶5.)  She was angry and
frustrated because she and Hebert had missed their Thanksgiving
dinner while looking for Hebert's wallet.  (Killiany Dep. at
132; Pl.'s 56(a)(1), doc. #230-1 at ¶21.)  Defendant Officer
Guerrera knew that Killiany worked at the Superior Court in
Bantam because he occasionally delivered paperwork to her
office.  (Pl.'s 56(a)(1), doc. #233-1 at ¶6, Guerrera's 56(a)(2)
at ¶6.)

Plaintiff was wearing the same brown jacket he had worn at
Kmart, with the same maroon cap in his pocket.  He stated that
he did not speak English.  Another policeman spoke with him in
Spanish.  (Incident Report, doc. #222-5 at 2; Guerrera Dep. at
20-21, 26, 36.)  Officer Guerrera was not aware that plaintiff
had made any attempts to return the wallet prior to arriving at

the police station.[3]  (Pl.'s 56(a)(1), doc. #233-1 at ¶8;

Guerrera's 56(a)(2) at ¶8.)

Defendant Officer Guerrera arrested plaintiff on a charge

of larceny in the 6th degree.  (Guerrera's 56(a)(1), doc. #222

at ¶19; Pl.'s 56(a)(1), doc. #233-1 at ¶15.)   Other officers

processed the arrest (Guida Dep. at 62-65; Pl.'s 56(a)(1), doc.

#233-1 at ¶11) and seized a Kmart receipt from plaintiff's

wallet.  (Seizure Inventory, doc. #222-3.)   Hebert signed a

victim statement positively identifying plaintiff as the man

that was in line behind them at Kmart and stating: "I wish to

press charges against this male for the theft of my wallet."

Killiany signed the statement as a witness.  (Doc. #222-6.)

Guerrera worked an extra half-hour after the end of his shift to

complete the investigative paperwork.  (Guerrera Dep. at 54;

Pl.'s 56(a)(1) doc. #233-1 at ¶16.)   Police returned the wallet

to Hebert, and he found nothing missing.  (Pl.'s 56(a)(1), doc.

#230-1 at ¶9; Killiany's 56(a)(2) at ¶9.)

---

[3]Plaintiff alleges that after he left Kmart, he attempted to
return the wallet at a condominium address listed on Hebert's
driver's license.  No one answered the door, so plaintiff left a
note with his sister's phone number.  On his way home, his
sister informed him that the resident of the condominium had
called to say that he had not lost a wallet.  Plaintiff's
relative then telephoned the Winchester Police Department and
reported that plaintiff had found Hebert's wallet.  The duty
officer told them to take the wallet to the Torrington Police
Department.  (Second Am. Compl., doc. #137 at 4-5.)

In a letter to the Torrington police chief dated November 30, 2006, defendant Killiany commended the police officers for their efforts.  Her letter states:  "I heard several times from your officers that they wanted to 'help one of their own.'" (Doc. #233-4.)

On December 4, 2006, plaintiff went to the Bantam courthouse for his first court date on the larceny charge. Defendant Killiany worked at the Bantam courthouse in the Family Services Unit.  (Killiany Dep. at 5-7; Pl.'s 56(a)(1), doc. #230-1 at ¶1; Killiany's 56(a)(2), doc. #259 at ¶1.)  When she saw plaintiff, she pointed him out to her friend, Assistant State's Attorney Magdalena Campos.  (Pl.'s 56(a)(1), doc. #230-1 at ¶18; Killiany's 56(a)(2) at ¶18.)  Attorney Campos conversed with plaintiff in the vestibule of the prosecutor's office.[4] (Campos Dep. at 91-97, 150-53.)  After the conversation, plaintiff left the courthouse.  (Serafini's 56(a)(1), doc. #217-1 at ¶5; Pl.'s 56(a)(2), doc. #226 at ¶5.)  As plaintiff was leaving the courthouse, Killiany told him, "I wish you would say you were sorry.  I missed my Thanksgiving."  Plaintiff's sister informed Killiany they had tried to return the wallet to defendant Hebert's prior residence.  (Killiany Dep. at 69-70, 121; Pl.'s 56(a)(1), doc. #230-1 at ¶17.)

---

[4]Campos testified that she gave plaintiff a continuance date of January 5, 2007.  (Campos Dep. at 150-53).  Plaintiff disputes that testimony.

After plaintiff left the building, State's Attorney Campos called his case in court.  She requested a continuance date, and Superior Court Judge Richard M. Marano granted it.  (Tr. 12/4/06, doc. #28 at 3-4.)  Defendant Jane Serafini, who was acting as courtroom clerk that day, marked the court file "NG" to indicate a plea of not guilty, checked the box for jury election and wrote "1-5" as the continuance date.  (Court File, doc. #150 at 6; Serafini's 56(a)(1) at ¶7; Pl.'s 56(a)(2), doc. #226 at ¶7.)

Serafini had been working as an administrative assistant for the Superior Court at Bantam for fourteen years.  (Serafini Dep. at 6-8; Pl.'s 56(a)(1), doc. #227-1 at ¶¶3-4.)  She has no formal legal education.  (Serafini Aff., #217-4 at ¶2; Serafini's 56(a)(1), doc. #217-1 at ¶3; Pl.'s 56(a)(2), doc. #226 at ¶3.)  Her work required her to attend court proceedings and make notations in the court file of procedural developments. (Serafini Dep. at 6-8; Pl.'s 56(a)(1), doc. #227-1 at ¶¶3-4.) Serafini did not witness plaintiff's conversation with Assistant State's Attorney Campos.  (Serafini's 56(a)(1), doc. #217-1 at ¶5; Pl.'s 56(a)(2), doc. #226 at ¶5.)  When she entered notations in plaintiff's case file on December 4, 2006, Serafini assumed that Attorney Campos had informed him of the continuance date.  It was common practice at the Bantam courthouse for the state's attorney to meet with a criminal defendant on the first

appearance date and give him a continuance date, after which the state's attorney would announce the continuance date in court in the defendant's absence.  This practice occurred multiple times per week.  (Serafini Dep. at 119-29; Wittstein Dep. at 57; Serafini's 56(a)(1) at ¶¶12-13; Pl.'s 56(a)(2), doc. #226 at ¶¶12-13.)

On January 5, 2007, defendant Serafini again was acting as courtroom clerk when plaintiff's case was called by Superior Court Judge Charles D. Gill.  Plaintiff did not appear, and the judge ordered his rearrest on a charge of failure to appear. Supervising State's Attorney Andrew Wittstein recommended a "substantial bond," and the judge set a $5000 cash or surety bond.[5]  (Tr. 1/5/07, doc. #28 at 7-8.)  On January 29, 2007, the order of rearrest and bond was noted in the police blotter of a local newspaper, the Torrington Register-Citizen.  (Doc. #231-8.)

On January 10, 2007, defendant Serafini generated an arrest warrant application on the failure to appear charge.  The application included a form affidavit stating that "the accused" was "directed to appear" and "failed to appear . . . when

_____

[5]Sometimes when a defendant missed a court appearance, judges at the Bantam courthouse ordered a warning to be mailed (called a bail notice) in lieu of immediate rearrest.  (Campos Dep. at 54-56.)  Plaintiff alleges that Attorney Wittstein advocated for rearrest and substantial bond in this case at Killiany's behest.

legally called according to terms of his/her bail bond promise to appear" and that the court "ordered that a warrant be issued for the arrest of the accused for failure to appear and set the following conditions for release."  Serafini filled in plaintiff's case data including the charge of larceny in the 6th degree, the date on which he failed to appear (January 5, 2007), the $5000 cash or surety bond and the new charge of Failure to Appear in the 2nd degree.  She then dated and signed the affidavit.  (Arrest Warrant, doc. #150 at 9.)  In a typical week, Serafini signs ten such affidavits after confirming the data in the case file, after which a state's attorney signs the warrant application and submits it to a judge.  (Serafini's 56(a)(1) at ¶20; Pl.'s 56(a)(2), doc. #226 at ¶20.)  On January 11, 2007, a state's attorney signed the application portion of the document, and Judge Marano signed the warrant.  (Doc. #150 at 9.)  Plaintiff was arrested and charged with failure to appear in the 2nd degree.  (Serafini's 56(a)(1) at ¶22; Pl.'s 56(a)(2), doc. #226 at ¶22.)

On March 1, 2007, at a hearing before Judge Marano at which defendant Serafini was acting as courtroom clerk, plaintiff argued through counsel that he had not been arraigned properly. At the judge's request, Serafini read her notations from the court file.  State's Attorney Wittstein then explained that plaintiff had not physically appeared before a judge on December

11

4, 2006 but instead had spoken to Attorney Campos, who gave plaintiff a continuance date.  Judge Marano asked Serafini to read the charges, took plaintiff's not-guilty pleas and jury election and set a continuance date.  (Tr. 3/1/07 at 9-10, 13.)

On April 17, 2007, at his next appearance before Judge Marano, plaintiff moved to dismiss the failure to appear charge, arguing that on December 4, 2006 he had neither appeared before a judge nor received notice of the January 5th continuance date. (Tr. 4/17/07, doc. #88-6 at 43-44.)  The State objected that Attorney Campos had orally conveyed the continuance date to plaintiff on December 4th, after which the court "entered a not guilty plea automatically as it does for statistical purposes." (Id. at 45-46.)  Judge Marano indicated that he understood the parties' positions.  (Id. at 48-50.)  On May 8, 2007, in a written ruling, Judge Marano found probable cause to sustain the failure to appear charge and denied plaintiff's motion to dismiss.  (Doc. #88-12 at 22-25.)  On May 24, 2007, Judge Marano denied plaintiff's motion for reconsideration.  (Doc. #88-12 at 32-33, 41.)

On September 25, 2007, the State entered a nolle prosequi, explaining that difficulties with witnesses made it unwise to proceed with the prosecution.  On plaintiff's motion, the charges were dismissed.  (Tr. 9/25/07, doc. 88-6 at 62.)

During the pendency of the criminal case, defendants Killiany and Officer Guerrera had contact with the prosecuting attorneys.  Defendant Killiany spoke to Assistant State's Attorney Campos four times about the case.  (Killiany Dep. at 61; Pl.'s 56(a)(1), doc. #230-1 at ¶21; Killiany's 56(a)(2) at ¶21.)  She spoke to Supervisory Assistant State's Attorney Wittstein about the case three times.  The first time was during a court recess[6] when she described the Thanksgiving Day incident to him.  The second time he informed her that plaintiff had been rearrested, and the third time he informed her that the case would be dismissed.  Attorney Wittstein made notes on the prosecutor's file including "Do Not Nolle," and "speaks English."  He also wrote "Victim Pissed" in reference to Killiany.  He assumed that she was speaking both for herself and for Hebert and thought of her as the "combined victim." (Prosecutor's File, doc. #230-9; Wittstein Dep. at 28-41; Pl.'s 56(a)(1), doc. #230-1 at ¶21; Killiany's 56(a)(2) at ¶21.)  The prosecutor's file also contained an undated, typed victim's letter with Hebert's name listed at the bottom.  (Doc. #230-5.) Killiany "contributed" to this letter.  Hebert did not write the letter.  (Killiany Dep. at 118-20; Hebert Dep. at 47-48, 86-90;

---

[6]Killiany was often in court because it was her duty to make recommendations to the court during arraignment proceedings on domestic violence charges.  (Killiany Dep. at 5-7; Pl.'s 56(a)(1), doc. #230-1 at ¶1.)

Pl.'s 56(a)(1), doc. #230-1 at ¶24; Killiany's 56(a)(2) at ¶24.)
The letter included the following statement: "Given
[plaintiff's] skillful and swift actions, I am certain this is
not the first time this man has stolen from someone.  What was
also concerning was that the arresting police officer stated
that Mr. Garcia is employed as a CNA.  It is frightening to
think that a thief could be working [with] elderly and sick
people who are easy targets for being victimized."  (Doc. #230-
5.)

    At some point while the criminal case was pending, Attorney
Wittstein asked defendant Officer Guerrera to contact
plaintiff's employer to ask whether plaintiff understood and
spoke English.  The employer responded that plaintiff needed to
speak and understand English for his job.  Guerrera verbally
informed Attorney Wittstein, who asked him not to generate a
supplemental written report.  (Guerrera Letter, doc. #222-7;
Guerrera Dep. at 85-86; Pl.'s 56(a)(1), doc. #233-1 at ¶35.)

    During the period in which she took clerical actions in
plaintiff's criminal case, defendant Serafini did not speak to
anyone about the larceny charge or the underlying incident.
(Serafini Dep. at 33-34; Serafini Aff., doc. #217-4 at 3-4;
Serafini's 56(a)(1) at ¶24; Pl.'s 56(a)(2), doc. #226 at ¶24.)

IV.  <u>Standard of Review</u>

A party is entitled to summary judgment if the record, including pleadings, depositions, answers to interrogatories, admissions and affidavits, establishes that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56.  The moving party has the initial burden of showing an absence of evidence to support an essential element of the opposing party's claim.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  To overcome this showing, the party opposing summary judgment "bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'"  <u>Amnesty Am. v. Town of W. Hartford</u>, 288 F.3d 467, 470 (2d Cir. 2002) (quoting <u>Celotex</u>, 477 U.S. at 324).  The court must view the evidence in the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.  <u>See</u> <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000).  On cross motions for summary judgment, the same standard applies.  <u>Morales v. Quintel Entertainment</u>, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  Each party's motion is examined on its own merits, and the court need not enter judgment for either party.  <u>Id.</u>; <u>Marcoux v. American Airlines, Inc.</u>, 645 F. Supp. 2d 68 (E.D.N.Y. 2008).

"On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial." Nora Beverages v. Perrier Group of Am., 164 F.3d 736, 746 (2d Cir. 1998).

V.   Plaintiff's Motion in Limine (doc. #225)

As a preliminary matter, plaintiff seeks to exclude from consideration the Kmart surveillance video offered by defendants Officer Guerrera and Killiany.  (Docs. #93, #223.)  He argues that it is inadmissible on two grounds.

Plaintiff's first ground for exclusion is authenticity.  He argues that the video cannot be properly authenticated because it is a duplicate copy.  Rule 1002 of the Federal Rules of Evidence provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  However, Rule 1003 provides that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."  At his deposition, plaintiff admitted that the video shows him taking defendant Hebert's wallet. (Garcia Dep. at 96-105.)  The police evidence custodian affirmed that the exhibit is an authentic copy of that video.  (Murphy Aff., doc. #251-1 at ¶¶ 18-19.)  In view of this evidence, there is no genuine question as to authenticity.

16

Plaintiff's second ground for exclusion of the video is based on a series of suppositions. When defendants showed the video to plaintiff at his deposition, he admitted that it shows him taking defendant Hebert's wallet. He agreed that he saw a video of these events on a prior occasion but thought it had been shot from a different angle. (Garcia Dep., doc. #222-11 at 96-102.) From that testimony, plaintiff speculates that there must have been two videos, one shot from the other angle (which he labels the "original" video) and the one defendants offer into evidence (which he labels the "substitute" video). Plaintiff next seizes on a notation in the evidence log stating "Destroy per Kmart." (Doc. #225-6 at 3.) Although other pages in the evidence file clarify that the video was not among the items destroyed (docs. #225-9, #251-3), plaintiff advances an argument that defendants destroyed the alleged "original" video because the so-called "substitute" was more favorable to their case. (Pl.'s Mem., doc. #225-1 at 4-5.)

The court is not persuaded that defendants have concealed, destroyed or substituted video evidence. The affidavit of the police evidence custodian affirms that he destroyed other evidence but not the surveillance video.[7] (Murphy Aff., doc.

---

[7]The full inventory of evidence was two Kmart receipts and one surveillance video. The receipts were destroyed pursuant to a state court order because they were not claimed after six months. (Docs. #225-6, #225-9, #251-3.)

#251-1 at ¶¶ 9-12.)  The custodian adds: "I made two true and accurate DVD copies of the [original video]tape for Officer Guerrera for use in this case.  A second or substitute tape has never existed.  The original VHS tape was not destroyed.  It remains in my custody."  (Id. at ¶¶ 18-19.)  In light of the foregoing, the exhibit is admitted for purposes of summary judgment.

VI.  Guerrera Cross Motions (docs. #220, #233)

As to defendant Officer John (Giovanni) Guerrera, plaintiff claims false arrest, malicious prosecution and other Fourth Amendment violations under 42 U.S.C. § 1983 (Counts Two and Four) and state law (Counts One and Three).  He also brings a state-law claim of intentional infliction of emotional distress (Count Twelve).

A.  False Arrest and Malicious Prosecution

To prevail on a § 1983 claim for either false arrest or malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment by establishing the elements of the parallel claim under state law.[8]  Fulton v. Robinson, 289

---

[8]The Connecticut Supreme Court has articulated the elements of these claims as follows.  To prevail on a claim of false arrest, a plaintiff must prove that "his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly."  Berry v. Loiseau, 223 Conn. 786, 820 (1992).  With respect to malicious prosecution, a plaintiff must prove that: "(1) the defendant initiated or

F.3d 188, 195 (2d Cir. 2002) (false arrest); <u>Davis v. Rodriguez</u>,
364 F.3d 424, 433-34 (2d Cir. 2004) (malicious prosecution).
Claims of false arrest and malicious prosecution implicate the
Fourth Amendment right to be free from unreasonable seizures.
<u>Jocks v. Tavernier</u>, 316 F.3d 128, 134 (2d Cir. 2003).  Under
Connecticut law, a plaintiff claiming false arrest or malicious
prosecution has the burden of proving the absence of probable
cause.  <u>Estrada v. Torres</u>, 646 F. Supp. 2d 253, 257 (D. Conn.
2009) (citing <u>Bhatia v. Debek</u>, 287 Conn. 397, 410-11 (2008)
(malicious prosecution); <u>Beinhorn v. Saraceno</u>, 23 Conn. App.
487, 491 (1990) (false arrest)).  The existence of probable
cause is an absolute defense to claims of false arrest and
malicious prosecution.  <u>Ruttkamp v. De Los Reyes</u>, No.
3:10cv392(SRU), 2012 WL 3596064, at *5 (D. Conn. Aug. 20, 2012)
(citing <u>Caldarola v. Calabrese</u>, 298 F.3d 156, 161 (2d Cir.
2002)).

    Officer Guerrera seeks summary judgment on the ground that
he had probable cause to arrest and charge plaintiff with

---

procured the institution of criminal proceedings against the
plaintiff; (2) the criminal proceedings have terminated in favor
of the plaintiff; (3) the defendant acted without probable
cause; and (4) the defendant acted with malice, primarily for a
purpose other than that of bringing an offender to justice."
<u>McHale v. W.B.S. Corp.</u>, 187 Conn. 444, 447 (1982).

larceny in the 6th degree.[9]  "Probable cause to arrest exists
when the officers have knowledge of, or reasonably trustworthy
information as to, facts and circumstances that are sufficient
to warrant a person of reasonable caution in the belief that an
offense has been or is being committed by the person to be
arrested."  Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir.
2007).  In other words, the court must assess "whether the facts
known by the arresting officer at the time of the arrest
objectively provided probable cause to arrest."  Jaegly v.
Couch, 439 F.3d 149, 153 (2d Cir. 2006) (citing Devenpeck v.
Alford, 543 U.S. 146, 153 (2004)).  Because probable cause
"requires only a probability or substantial chance of criminal
activity, not an actual showing of such activity," it is a lower
standard than preponderance of the evidence.  United States v.
Juwa, 508 F.3d 694, 701 (2d Cir. 2007) (quoting Illinois v.
Gates, 462 U.S. 213, 243 n. 13 (1983)).

Plaintiff offers several arguments against probable cause.
He argues that because one form of larceny, a charge of larceny
of mislaid property, requires "fail[ure] to take reasonable

---

[9]Officer Guerrera urges the court to apply the doctrine of
collateral estoppel to bar plaintiff from challenging probable
cause, an issue that the state court addressed in the criminal
case.  Plaintiff responds that collateral estoppel should not
apply because he did not receive a full and fair hearing in the
Superior Court.  (Pl's Mem., doc. #237 at 35-36.)  Because the
court finds that Officer Guerrera had probable cause, it need
not reach collateral estoppel.

measures to restore the property to a person entitled to it,"
Conn. Gen. Stat. § 53a-119(4), his alleged attempt to return the
wallet to Hebert's home address and his eventual delivery of the
wallet to the police station insulated him from liability.[10]  He
also accuses Officer Guerrera of failing to investigate
thoroughly, making the arrest without a positive identification,
and basing the probable cause determination on "false material"
and "omitted information."

    None of these arguments is availing.  When plaintiff
arrived at the police station, he had the wallet in his
possession, Officer Guerrera recognized his jacket from the
surveillance video, and Killiany verbally identified him as the
man she had seen earlier.[11]  On the video, Officer Guerrera saw

---

[10]"A person commits larceny when, with intent to deprive
another of property or to appropriate the same to himself or a
third person, he wrongfully takes, obtains or withholds such
property from an owner.  Larceny includes, but is not limited
to: . . . (4) Acquiring property lost, mislaid or delivered by
mistake.  A person who comes into control of property of another
that he knows to have been lost, mislaid, or delivered under a
mistake as to the nature or amount of the property or the
identity of the recipient is guilty of larceny if, with purpose
to deprive the owner thereof, he fails to take reasonable
measures to restore the property to a person entitled to it."
Conn. Gen. Stat. § 53a-119.  "A person is guilty of larceny in
the sixth degree when he commits larceny as defined in section
53a-119 and the value of the property or service is five hundred
dollars or less."  Conn. Gen. Stat. § 53a-125b.

[11]After Officer Guerrera brought the surveillance video to
the police station, another police officer misidentified the man
on the video as a transient named "Weston."  That officer then
went out looking for Weston.  (Guida Dep. at 49-60.)  Plaintiff

plaintiff concealing the wallet from the cashier, and he was aware that plaintiff, regardless of his English proficiency, had declined an opportunity to interact with Hebert as he exited the store with Hebert's wallet.  These facts were sufficient for a person of reasonable caution to believe that plaintiff had committed larceny.  Once he had probable cause to arrest, Officer Guerrera was not required to investigate whether plaintiff had attempted to return the wallet, nor was he required to believe to a certainty that the charge would be successfully prosecuted despite plaintiff's delivery of the wallet to the police station.  As the Second Circuit has instructed, once a police officer has probable cause, he is not "required to explore and eliminate every theoretically plausible claim of innocence" before arresting a suspect.  Panetta v. Crowley, 460 F.3d 388, 398 (2d Cir. 2006) (quoting Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)).  In fact, he is "neither required nor allowed" to continue investigating, sifting and weighing information.  Id. (quoting Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)).  Nor is the officer required to "believe with certainty that the arrestee will be successfully prosecuted."  Id. at 396 (quoting Curley, 268 F.3d

---

appears to argue that he was arrested on the basis of his
resemblance to Weston and/or because he is "a dark-skinned
Hispanic."  (Pl.'s Mem., doc. #237 at 11-12, 28-29.)  The
argument is unpersuasive in light of the facts known to Officer
Guerrera at the time of plaintiff's arrest.

at 70).  See also Southerland v. City of New York, 681 F.3d 122,
127 (2d Cir. 2012) ("[w]hile probable cause requires more than
'mere suspicion,' . . . it does not demand 'hard certainties'")
(citations omitted); cf. Dawkins v. Williams, 511 F. Supp. 2d
248, 276 (N.D.N.Y. 2007) (no probable cause to charge where
evidence before police investigator included "conspicuous
exculpatory statements").

Finally, plaintiff's argument that the probable cause
determination was based on "false material" and "omitted
information" is inapt.  He bases his argument on case law
involving issues of false statements or material omitted from
arrest warrant affidavits presented to a magistrate.  See, e.g.,
Golino v. New Haven, 950 F.2d 864, 870 (2d Cir. 1991) (summary
judgment properly denied where arrest warrant affidavit
contained false statements and omitted information that was
critical to finding of probable cause).  Here, Officer Guerrera
effected a warrantless arrest, so case law regarding the content
of a warrant affidavit does not apply.

Because Officer Guerrera had probable cause to arrest and
charge him, plaintiff cannot prevail on his claims of false
arrest and malicious prosecution under § 1983.

B.  Other § 1983 Fourth Amendment Claims[12]

Plaintiff next maintains that Officer Guerrera violated his Fourth Amendment rights when he searched his wallet and seized the Kmart receipt after plaintiff was arrested.  The claim cannot be levied at Officer Guerrera given plaintiff's concession that his wallet was searched by a different police officer.  (Doc. #237 at 12, 29-30.)  Regardless, "it is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."  United States v. Robinson, 414 U.S. 218, 224 (1973).

In addition, plaintiff argues that Officer Guerrera handcuffed him unreasonably.  There is no evidence to support the claim that Officer Guerrera handcuffed him.[13]  Nonetheless,

---

[12]Besides his Fourth Amendment allegations, plaintiff contends that Officer Guerrera violated his "Fifth and Sixth [A]mendment guarantees against self-incrimination and right to counsel." (Pl.'s Mem., doc. #237 at 18.)  Because he supplies no evidence or argument to substantiate the contentions, the court does not address them.  Plaintiff also argues that procedural deficiencies in the April 17, 2007 court proceeding deprived him of his right to confront witnesses under the Sixth Amendment. (Id. at 37.)  This is a futile argument.  The state court, not Officer Guerrera, decided how the criminal case would proceed.

[13]Plaintiff testified that "another policeman came, a younger guy.  He cuffed me, and took me to the back." (Garcia Dep. at 80.)  Officer Guerrera testified that he could not recall who processed the arrest. (Guerrera Dep. at 38-39.)  In deposition testimony, a different police officer inferred from

even assuming that Officer Guerrera did handcuff him and that a jury could find this use of force unreasonable, Officer Guerrera is entitled to qualified immunity.  Qualified immunity shields government officials from liability for civil damages unless (1) viewed in the light most favorable to the party asserting the injury, the facts as alleged amount to a violation of a constitutional or statutory right, and (2) the right was "clearly established" at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001).  At the time of plaintiff's arrest, "'[n]either the Supreme Court nor the Second Circuit [had] established that a person has a right not to be handcuffed in the course of a particular arrest.'"  Warner v. Gyle, No. 3:09-CV-199(RNC), 2010 WL 3925211, at *2 (D. Conn. Sept. 30, 2010) (quoting Soares v. Connecticut, 8 F.3d 917, 922 (2d Cir. 1993)).

    C.   Intentional Infliction of Emotional Distress

    Plaintiff also claims intentional infliction of emotional distress (Count Twelve) in connection with his arrest.  To prevail on a claim of intentional infliction of emotional distress in Connecticut, a plaintiff must prove:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct;
> (2) that the conduct was extreme and outrageous; (3)

the paperwork that he (not Guerrera) had booked plaintiff but could not recall handcuffing him.  (Guida Dep. at 62-64.)

that the defendant's conduct was the cause of the
plaintiff's distress and (4) that the emotional
distress sustained by the plaintiff was severe.

Petyan v. Ellis, 200 Conn. 243, 253 (1986).  "Liability has been
found only where the conduct has been so outrageous in
character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized community."  Appleton v.
Board of Educ. of Town of Stonington, 254 Conn. 205, 210-11
(2000) (citing 1 Restatement (Second), Torts § 46, comment (d),
p. 73 (1965)).  This is initially a question for the court and
becomes a factual issue only where reasonable minds disagree.
Id. at 210.

     As a matter of law, absent other factors that may
constitute "extreme and outrageous" conduct, a routine arrest
will not be considered intentional infliction of emotional
distress if the arresting officer has probable cause to arrest.
Moreno v. City of New Haven Dept. of Police Service, 604 F.
Supp. 2d 364, 376 (D. Conn. 2009).  Here, Officer Guerrera had
probable cause to effect the routine arrest, and he is entitled
to summary judgment on the intentional infliction claim.

VII. Killiany Cross-Motions (docs. #218, #230)

     With respect to defendant Lisa Killiany, plaintiff claims
false arrest and malicious prosecution in connection with the
larceny charge under 42 U.S.C. § 1983 (Counts Two and Four) and

26

state law (Counts One and Three).  He brings the same claims

under § 1983 (Counts Six and Eight) and state law (Counts Five

and Seven) in connection with the failure to appear charge.

Finally, he brings state-law claims of defamation (Count Eleven)

and intentional infliction of emotional distress (Count Twelve).

A.  <u>False Arrest and Malicious Prosecution</u>

Although defendant Killiany did not directly arrest or

charge plaintiff with larceny and failure to appear, plaintiff

alleges that she collaborated with defendant Officer Guerrera,

defendant Serafini and State's Attorneys Campos and Wittstein to

trump up charges against him as revenge for ruining her

Thanksgiving dinner and to shield defendant Hebert from

discipline for losing his police badge.[14]  "Claims for false

_____

[14]Plaintiff alleges without further explanation that
Killiany was acting under color of state law.  Although Killiany
was a state employee, "mere employment by the state does not
mean that the employee's every act can properly be characterized
as state action."  <u>Patterson v. County of Oneida, N.Y.</u>, 375 F.3d
206, 230 (2d Cir. 2004) (citing <u>West v. Atkins</u>, 487 U.S. 42, 49-
50 (1988) ("generally, a public employee acts under color of
state law while acting in his official capacity or while
exercising his responsibilities pursuant to state law")).
Alternatively, a private individual may be deemed a state actor
for § 1983 purposes "if he or she willfully collaborated with an
official state actor in the deprivation of the federal right."
<u>Dwares v. City of New York</u>, 985 F.2d 94, 98 (2d Cir. 1993); <u>see
also</u> <u>Khulumani v. Barclay Nat. Bank Ltd.</u>, 504 F.3d 254, 316 (2d
Cir. 2007) (private actor "must jointly participate in the
wrongful conduct, pursuant to a common design or plan");
<u>Shattuck v. Town of Stratford</u>, 233 F. Supp. 2d 301, 313 (D.
Conn. 2002) (private actor may be liable for § 1983 false arrest
or malicious prosecution if she instigated the arrest or

arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law."[15]  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). Under Connecticut law, a plaintiff claiming false arrest or malicious prosecution has the burden of proving the absence of probable cause.  Estrada v. Torres, 646 F. Supp. 2d 253, 257 (D. Conn. 2009) (citing Bhatia v. Debek, 287 Conn. 397, 410-11 (2008) (malicious prosecution); Beinhorn v. Saraceno, 23 Conn. App. 487, 491 (1990) (false arrest)).  The existence of probable cause is an absolute defense to claims of false arrest and malicious prosecution.  Ruttkamp v. De Los Reyes, No. 3:10cv392(SRU), 2012 WL 3596064, at *5 (D. Conn. Aug. 20, 2012) (citing Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002)).

In light of the court's finding supra that Officer Guerrera had probable cause to arrest plaintiff, Killiany is entitled to summary judgment on the claims of false arrest and malicious prosecution regarding the larceny charge.  As for the failure to appear charge, that was a secondary development in the criminal

commenced the proceedings).  Because the claim fails on other grounds, the court need not linger on this issue.

[15]See elements of false arrest and malicious prosecution supra at n.8.

case for which no reasonable jury would find Killiany responsible.  She was not present when Attorney Campos allegedly gave plaintiff a continuance date or at any of the subsequent court proceedings.  There is no evidence that she sought rearrest or encouraged prosecution on the failure to appear charge.  She did not discuss plaintiff's case with Serafini, the administrative assistant who prepared the rearrest warrant.  In fact, Killiany first learned of the failure to appear charge in a passing conversation with Attorney Wittstein after rearrest already had been ordered.  Negative inferences from Killiany's thank-you letter to the Torrington Police Department, friendship with Attorney Campos and communication with the prosecution as a purported victim are not sufficient to establish that she instigated plaintiff's rearrest and prosecution on the charge of failure to appear.  For these reasons, she is entitled to summary judgment on the claims of false arrest and malicious prosecution.[16]

    B.  <u>Defamation</u>

Killiany is also entitled to summary judgment on plaintiff's claim that she defamed him by calling him "motherf--

---

[16]In Counts Four and Eight, plaintiff appears to allege that Killiany is responsible for the fact that he was not informed on December 4, 2006 of an indigent's Sixth Amendment right to appointed counsel.  (Second Am. Compl., doc. #137 at ¶¶ 19B, 36, 54.)  Because he supplies no evidence or argument to substantiate the contentions, the court does not address it.

-er" at the police station in Torrington.[17]  To establish a <u>prima facie</u> case of defamation, a plaintiff must demonstrate that (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement.  <u>Cweklinsky v. Mobil Chemical Co.</u>, 267 Conn. 210, 217 (2004).  A communication injures a plaintiff's reputation if it "tends to . . . lower him in the estimation of the community or to deter third persons from associating or dealing with him."  3 Restatement (Second), Torts § 559, <u>quoted in</u> <u>QSP, Inc. v. Aetna Cas. and Sur. Co.</u>, 256 Conn. 343, 356 (2001).  No reasonable jury could find that directing a general

---

[17]In his brief, plaintiff also claims that he was defamed by the mention of his rearrest in the newspaper's police blotter (doc. #234-8) and by Killiany's statements in the victim letter in his court file (doc. #230-5).  These claims were not alleged in the complaint (doc. #137) and cannot be raised for the first time on summary judgment.  Regardless, Killiany is not liable for the newspaper's statement because she did not make it.  Nor for that matter could any party be liable for publishing the fact of plaintiff's rearrest.  <u>Holmes v. Town of East Lyme</u>, 866 F. Supp. 2d 108, 133 (D. Conn. 2012) ("truth is a complete defense to a claim of defamation").  As for Killiany's contributions to the victim letter, those statements are privileged from a claim of defamation because they were made for the purpose of marshaling the state's evidence for a judicial proceeding.  <u>See</u> <u>Rioux v. Barry</u>, 283 Conn. 338, 343 (2007) (public policy justifies immunity from defamation suit for "those who provide information in connection with judicial and quasi-judicial proceedings"); <u>Kelley v. Bonney</u>, 221 Conn. 549, 572-74 (1992) (communications made to discrete group for purpose of marshaling evidence for quasi-judicial proceeding were privileged from defamation suit).

expletive at plaintiff in the presence of his relative and
several police officers caused an actionable injury to his
standing in the community or would deter third persons from
associating or dealing with him.

C.  <u>Intentional Infliction of Emotional Distress</u>

Plaintiff next claims of intentional infliction of
emotional distress (Count Twelve).  To prevail on a claim of
intentional infliction of emotional distress in Connecticut, a
plaintiff must prove:

> (1) that the actor intended to inflict emotional
> distress; or that he knew or should have known that
> emotional distress was a likely result of his conduct;
> (2) that the conduct was extreme and outrageous; (3)
> that the defendant's conduct was the cause of the
> plaintiff's distress and (4) that the emotional
> distress sustained by the plaintiff was severe.

<u>Petyan v. Ellis</u>, 200 Conn. 243, 253 (1986).  "Liability has been
found only where the conduct has been so outrageous in
character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized community."  <u>Appleton v.
Board of Educ. of Town of Stonington</u>, 254 Conn. 205, 210-11
(2000) (citing 1 Restatement (Second), Torts § 46, comment (d),
p. 73 (1965)).  This is initially a question for the court and
becomes a factual issue only where reasonable minds disagree.
<u>Id.</u> at 210.

Plaintiff contends that Killiany exploited her connections as a courthouse employee and wife of a police officer to convince the police, the prosecutors and the courtroom clerk to prosecute him with unusual vigor.  He theorizes that she wanted revenge because her Thanksgiving holiday was ruined and her husband was embarrassed in front of his brother officers, citing circumstantial evidence such as Killiany's use of an expletive at the police station, her thank-you note to the Torrington police for treating Hebert as "one of your own," her conversations with prosecutors and her drafting of a letter to the prosecutor over Hebert's name.

Although the circumstances of plaintiff's initial appearance at the Bantam courthouse are disturbing,[18] Killiany's own conduct was not extreme or outrageous.  With respect to the expletive, "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Appleton v. Board of Educ. of Town of Stonington, 254 Conn. 205, 211 (2000).

---

[18]The Second Circuit affirmed this court's dismissal of plaintiff's claims against the state's attorneys on the basis of absolute prosecutorial immunity but noted that it was "disturbed by the allegations of prosecutorial conduct" and described the practices as "if not unconstitutional, likely illegal and certainly improper." Garcia v. Hebert, No. 09-1615-CV, 352 Fed. Appx. 602 (unpublished), 2009 WL 3765549 (2d Cir. Nov. 12, 2009).

As for her communication with prosecutors, Article 1, § 8 of the Constitution of the State of Connecticut gives a victim of a crime the right to communicate with the prosecution and the right to notification of court proceedings.  See also Conn. Gen. Stat. § 1-1k ("crime victim" means an individual who suffers direct or threatened physical, emotional or financial harm as a result of a crime).  It is apparent by their notations on the case file that Assistant State's Attorneys Campos and Wittstein considered Killiany to be a crime victim.  As a result, her communications with the state's attorneys were within the "bounds of deceny" as expressed in the state constitution.  To the extent that plaintiff might be contending that the state's attorneys gave Killiany a degree of access to which she was not entitled by statute, the responsibility for that decision is theirs.  In sum, Killiany is entitled to summary judgment on the claim of intentional infliction of emotional distress.

VIII.  Serafini Cross-Motions (docs. #217, #227)

Turning to the allegations against defendant Jane Serafini, plaintiff claims false arrest, malicious prosecution and abuse of process[19] under 42 U.S.C. § 1983 (Counts Six, Eight and Ten) and state law (Counts Five, Seven and Nine) in connection with

---

[19]See elements of false arrest and malicious prosecution supra at n.8.  To prevail on a claim of abuse of process, a plaintiff must prove that the defendant used a legal process against another primarily to accomplish a purpose for which it was not designed.  Mozzochi v. Beck, 204 Conn. 490, 494 (1987).

his arrest and prosecution on the failure to appear charge.  He also claims intentional infliction of emotional distress (Count Twelve) under state law.

The relevant undisputed facts are as follows.  Although plaintiff was not present when his case was called on his initial court date, courtroom clerk Serafini entered a continuance date, not-guilty plea and jury election in the court file on December 4, 2006.  After he failed to appear on the continuance date and the judge ordered his rearrest, Serafini generated an arrest warrant affidavit stating that he had been "directed to appear" on the continuance date.  Finally, she read the contents of the court file when so ordered by the judge during a subsequent proceeding.  Both the notations in the file and the generation of the affidavit were undertaken pursuant to established courthouse practices.  Plaintiff urges the court to infer from Serafini's actions that she deliberately misled the court so as to trump up charges against plaintiff at defendant Killiany's behest.

Serafini maintains that she is entitled to absolute quasi-judicial immunity because her actions were part of the judicial process.  Judicial immunity does not attach per se.  It depends on "the nature of the function performed, not the identity of the actor who performed it."  Forrester v. White, 484 U.S. 219,

34

229 (1988).  Under this functional approach,[20] court clerks are immune from suit "for performance of tasks which are judicial in nature and an integral part of the judicial process."  Rodriguez v. Weprin, 116 F.3d 62, 66 (2d Cir. 1997).  Specifically, quasi-judicial immunity attaches when a court clerk undertakes "discretionary acts that implement judicial decisions or that are performed at the discretion or under the supervision of a judge."  Bliven v. Hunt, No. 05-CV-4852 (SJF/LB), 2005 WL 3409620, *2 (E.D.N.Y. Dec. 12, 2005) (citations omitted).  Additionally, court clerks are absolutely immune from suit for "functions which are administrative in nature if the task was undertaken pursuant to the explicit direction of a judicial officer or pursuant to the established practice of the court."[21]

-------

[20]Whether quasi-judicial immunity attaches under the functional approach may be determined by the so-called Cleavinger factors:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

Cleavinger v. Saxner, 474 U.S. 193, 202 (1985), cited in Gross v. Rell ("Gross II"), 695 F.3d 211 (2d Cir. 2012).

[21]By contrast, court officers are not entitled to quasi-judicial immunity when they perform "purely ministerial and administrative" tasks that are non-judicial in nature or when they act outside the scope of her official duties.  Quitoriano

Humphrey v. Court Clerk for the Second Circuit, No. 5:08-CV-
0363, 2008 WL 1945308, at *2 (N.D.N.Y. May 1, 2008).  The
Connecticut state courts apply the same "functional approach" to
determine whether quasi-judicial immunity attaches to state-law
claims.  See Gross v. Rell ("Gross I"), 585 F.3d 72, 81-82 (2d
Cir. 2009) (citing Carrubba v. Moskowitz, 274 Conn. 533, 542-43
(2005)), question certified to Gross v. Rell, 304 Conn. 234,
273-281 (2012) (applying Cleavinger factors).

Defendant Serafini's actions in this case were an integral
part of the judicial process.  Her notations in the court file,
generation and signing of an affidavit and recitation of the
file contents were done either at a judge's direction or
pursuant to established practices of the state court at Bantam.
See, e.g., McKnight v. Middleton, 699 F. Supp. 2d 507, 525-26
(E.D.N.Y. 2010) (court clerk immune from claim that he "failed
to process" plaintiff's submissions), Humphrey v. Court Clerk
for the Second Circuit, No. 5:08-CV-0363, 2008 WL 1945308, at *2
(N.D.N.Y. May 1, 2008) (court clerk immune from claim that she
failed to timely inform plaintiff that his appeal was dismissed

---

v. Raff & Becker, LLP, 675 F. Supp. 2d 444, 450 (S.D.N.Y. 2009).
See, e.g., Forrester v. White, 484 U.S. 219, 229 (1988) (judge
not entitled to absolute immunity for decision to demote and
fire probation officer); Atherton v. D.C. Office of Mayor, 567
F.3d 672, 683-86 (D.C. Cir. 2009) (court officer's dismissal of
allegedly disruptive grand juror was administrative, not
adjudicative, and not subject to absolute quasi-judicial
immunity).

and neglected to update him on status of appeal); Pikulin v.
Gonzales, No. 07-CV-412, 2007 U.S. Dist. LEXIS 25551, *6, 2007
WL 1063353 (E.D.N.Y. April 5, 2007) (filing and docketing tasks
are integral part of judicial process); Humphrey v. Court Clerk,
NDNY, No. 5:05-CV-1159 (NAM), 2005 WL 2490155, * (N.D.N.Y. Oct.
7, 2005) (court clerks immune from claim that they failed to
advise plaintiff that e-mail address was not acceptable under
local rule for purposes of service and correspondence).  The
fact that Serafini's actions were subject to review by the judge
— and, moreover, were reviewed — is further indication of their
quasi-judicial nature.  See Gross v. Rell ("Gross II"), 695 F.3d
211, 213-14 (2d Cir. 2012) (citing Cleavinger factors including
"the presence of safeguards that reduce the need for private
damages actions as a means of controlling unconstitutional
conduct"); Bimler v. Crouch, No. 3:04CV1478 (WWE), 2005 WL
1074419, at *3 (D. Conn. May 02, 2005) (support enforcement
officer immune from claim that he "misrepresented material
facts" when drafting order because family support magistrate
reviewed the order).

     For these reasons, Serafini is entitled to absolute quasi-
judicial immunity on all claims.

IX.  Civil Conspiracy

     Finally, plaintiff claims that Officer Guerrera, Killiany
and Serafini are civil conspirators and therefore liable for the

tortious acts of the other defendants.  Civil conspiracy is not an independent cause of action.  Under § 1983, a claim of civil conspiracy requires proof of an underlying violation of a federal right.  Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) ("the [conspiracy] lawsuit will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right").  Similarly, under Connecticut law, "a claim of civil conspiracy must be joined with an allegation of a substantive tort." Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC, 739 F. Supp. 2d 104, 106-107 (D. Conn. 2010) (quoting Macomber v. Travelers Property & Casualty Corp., 277 Conn. 617, 636 (2006)).  Because the defendants are entitled to summary judgment on all underlying substantive claims, the civil conspiracy claims fail as a matter of law.  DeStefano v. Duncanson, No. 08 CIV. 3419 (GBD), 2011 WL 651452, at *4 (S.D.N.Y. Feb. 10, 2011) (dismissing § 1983 conspiracy claim); Presley v. Pepperidge Farm, Inc., 356 F. Supp. 2d 109, 136-37 (D. Conn. 2005) (summary judgment on state conspiracy claim).

X.  Conclusion

For the foregoing reasons, plaintiff's Motion in Limine (doc. #225) is DENIED; defendants' Motions for Summary Judgment (docs. #217, #218, #220) are GRANTED; and plaintiff's Cross-Motions (docs. #227, #230, #233) are DENIED.

This is not a recommended ruling.  The parties have consented to the authority of a magistrate judge in all proceedings in this case including the entry of final judgment pursuant to 28 U.S.C. 636(c) and Fed. R. Civ. P. 73.  (Doc. #276.)

SO ORDERED at Hartford, Connecticut this 27th day of March, 2013.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge

**APPENDIX of Filings by ECF Number**

| | |
|---|---|
| **P's Motion in Limine** | **#225** |
| **P's Memo** | #225-1 |
| **Ds' Responses** | #251, 261 |
| **P's Reply** | #267 (268) |

| | <u>**Serafini**</u> | <u>**Killiany**</u> | <u>**Guerrera**</u> |
|---|---|---|---|
| **D's SJ** | **#217** | **#218** | **#220** |
| **D's 56(a)(1)** | #217-1 | #219 | #222 |
| **D's Memo** | #217-2 | #219-8 | #221 |
| **P's 56(a)(2)** | #226 | #229 | #232-1 |
| **P's Cross-SJ** | **#227** | **#230** | **#233** |
| **P's 56(a)(1)** | #227-1 | #230-1 | #233-1 (232) |
| **P's Memo/Response** | #236 (239) | #235 (238) | #237 (240) |
| **D's Response/Reply** | #256 | #258 (260) | #252 (253) |
| **D's 56(a)(2)** | #257 | #259 | #266 (254) |
| **P's Reply** | #270 | #271 | #269 |